**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JUDY LARCOMB,<br><br>              Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>              Defendant. | CASE NO. 1:22-CV-01751-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Judy Larcomb ("Plaintiff" or "Ms. Larcomb") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner.

## I.       Procedural History

On February 25, 2020, Ms. Larcomb protectively filed applications for DIB and SSI.  (Tr. 224.)  In each, she alleged a disability onset date of January 1, 2018, but later amended her alleged onset date to February 14, 2020.  (Tr. 39-40, 226-39.)  She alleged disability due to irritable bowel syndrome ("IBS"), abdominal pain, fibromyalgia, chronic pain, degenerative disc disorder in back, and anemia.  (Tr. 110, 115.)  Ms. Larcomb's applications were denied at the

initial level (*id.*) and upon reconsideration (Tr. 123, 126), and she requested a hearing (Tr. 127). On July 15, 2021, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 32-68.)

On September 10, 2021, the ALJ issued a decision finding that Ms. Larcomb had not been under a disability within the meaning of the Social Security Act from February 14, 2020, the amended alleged onset date, through the date of the decision.  (Tr. 12-24.)  The Appeals Council denied Ms. Larcomb's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)

On March 3, 2021, Ms. Larcomb filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 10.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Larcomb was born in 1971 and was 46 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 23, 226.)  She had at least a high school education.  (Tr. 23.)  Ms. Larcomb had not worked since February 14, 2020, the amended alleged onset date.  (Tr. 17.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

The medical evidence pre-dating Ms. Larcomb's amended alleged onset date of February 14, 2020, will not be discussed at length herein.  Ms. Larcomb had a cholecystectomy in 2016. (Tr. 988.)  She reported gastrointestinal complaints such as abdominal pain, nausea, vomiting, and diarrhea in 2016, 2017, and 2019, with unremarkable diagnostic testing.  (*See, e.g.,* Tr. 371, 365-66, 389-98, 480-82, 489, 674-77.)  A 2017 x-ray of the cervical spine revealed mild discogenic disease at C4-C8 (Tr. 947), but a 2019 x-ray was normal (Tr. 598).   A 2019 CT of

2

the abdomen and pelvis revealed no evidence of acute process, but noted degenerative disc disease at L5-S1.  (Tr. 674.)

Ms. Larcomb attended an initial treatment visit with Mark Pellegrino, M.D., of Ohio Pain & Rehab Specialists on January 20, 2020, "for Fibromyalgia and to discuss medical marijuana." (Tr. 851-52.)  She complained of pain in multiple areas of her body since 2017, described as constant, sharp, burning, shooting, and aching.  (Tr. 851.)  She reported that the pain had a significant impact on her daily activities, was improved by ice, and worsened with walking, lifting, lying, twisting, sitting, bending, standing, and reaching.  (*Id.*) She reported previous treatment with physical therapy, chiropractic care, and nerve blocks.  (*Id.*)  She also reported a prior fibromyalgia diagnosis, and was interested in medical marijuana to treat her pain.  (*Id.*) Her physical examination findings were largely unremarkable, with normal, gait, balance, and range of motion; but she demonstrated tenderness to palpation in her spine and pain in 18 out of 18 tender points.  (Tr. 851-52.)  Dr. Pellegrino diagnosed fibromyalgia and mood disorder due to a known physiological condition with depressive features.  (Tr. 852.)  He recommended IV lidocaine therapy, registered her for medical marijuana, and referred her for counseling due to her depressed, anxious mood in relation to her chronic pain.  (*Id.*)

Ms. Larcomb returned to Dr. Pellegrino on March 2, 2020, for treatment of her fibromyalgia pain.  (Tr. 849-50.)  Dr. Pellegrino administered IV lidocaine, which Ms. Larcomb tolerated well.  (Tr. 849.)  She returned for another IV lidocaine procedure on April 30, 2020. (Tr. 847-48.)  She rated her pain at a nine on a ten-point scale before the procedure, and at a five after the procedure.  (Tr. 847.)  She tolerated the procedure well and was instructed to follow up in four weeks for a repeat procedure.  (*Id.*)

Ms. Larcomb attended an office visit with her primary care provider, Sonia Tanio, M.D., on June 12, 2020.  (Tr. 345.)  She complained of pain after hitting her right shoulder during a fall and Dr. Tanio prescribed a lidocaine patch.  (*Id.*)  On June 14 and 16, 2020, Ms. Larcomb presented to Southwest General Emergency Department complaining of pain in her chest after a fall.  (Tr. 718-95.)  X-ray imaging demonstrated that the right ribs were intact with no fracture.  (Tr. 723.)  Her diagnosis was a chest wall contusion secondary to fall with severe costochondral strain.  (Tr. 724, 761.)  During the June 14 emergency department visit, Ms. Larcomb was given Toradol and prescribed Norflex.  (Tr. 724.)  She returned to the emergency department on June 16, complaining of pain at a ten out of ten scale.  (Tr. 764.)  At that visit, she was prescribed a three-day supply of Percocet, a ten-day supply of Carafate, NSAID patches, and thirty days' supply of clonidine.  (Tr. 761.)  On June 22, 2020, Ms. Larcomb returned to the emergency department with continued complaints of pain from the same fall. (Tr. 799.)  She was given a two-day supply of Percocet and encouraged to follow up with her physician for further testing and pain management.  (Tr. 805.)

Ms. Larcomb returned to Dr. Pellegrino on June 23, 2020.  (Tr. 844-45.)  Her physical examination findings remained the same, with largely unremarkable findings except for tenderness to palpation of her spine and pain noted in 18 of 18 tender points.  (Tr. 844-45.)  Dr. Pellegrino noted that the previous two IV lidocaine treatments had caused migraine headaches and were discontinued.  (Tr. 845.)  He also noted that Ms. Larcomb was using Percocet prescribed by another provider for pain, and was using medical marijuana.  (*Id.*)  Dr. Pellegrino recommended a follow up appointment in six months.  (*Id.*)

Ms. Larcomb attended a counseling assessment with Carol Keeler, LPCC-S, of Cornerstone on July 23, 2020.  (Tr. 895-96.)  She sought counseling for anxiety, depression,

4

health problems, ADHD, and trouble sleeping.  (Tr. 895.)  She attended teletherapy sessions on July 30, August 6, and August 13, 2020, where she received cognitive behavioral therapy for anxiety and obsessive thinking and self-care.  (Tr. 895-96.)  She described a mildly depressed mood, difficulty sleeping, and many physical complaints.  (*Id.*)  After three sessions, Ms. Larcomb stopped attending and did not respond to rescheduling attempts.  (*Id.*)  LPCC Keeler was recommended that Ms. Larcomb follow up with a medical evaluation to assess whether her anxiety could have been caused or exacerbated by medication or physical conditions.  (*Id.*)

Ms. Larcomb followed up with Dr. Pellegrino again on December 23, 2020.  (Tr. 890-92.)  She reported pain of eight on a ten-point scale but appeared to be in no acute distress; her examination findings were similar to prior visits.  (Tr. 890-91.)  She reported that medical marijuana had helped.  (Tr. 892.)  She asked Dr. Pellegrino to complete a Disability Functional Capacities Statement, but he suggested it be completed by a physical therapist.  (*Id.*)  He renewed her medical marijuana and recommended follow up in one year.  (*Id.*)

On March 4, 2021, Ms. Larcomb underwent a neuropsychological examination with Richard Naugle, Ph.D., ABPP.  (Tr. 911-12.)  Ms. Larcomb appeared quite anxious and was tearful at times, apparently resulting from frustration.  (Tr. 911.)  She was alert and attentive, but sometimes talked over instructions or began tasks prior to being asked to do so.  (*Id.*)  Testing revealed that Ms. Larcomb functioned generally within the broad range of average.  (Tr. 911-12.)  Dr. Naugle found that her examination did not reveal evidence of a memory deficit or other neurocognitive syndrome.  (Tr. 912.)  Given her unremarkable neuropsychological profile, Dr. Neugle believed distractions imposed by chronic pain and anxiety were the likely etiology of her perception of cognitive decline.  (*Id.*)  He encouraged discontinuing her medical marijuana use because it has been associated with memory lapses in other people.  (*Id.*)

On April 30, 2021, Ms. Larcomb attended a new patient visit with rheumatologist David Blumenthal, M.D., at University Hospitals.  (Tr. 926-28.)  She had last been seen at the rheumatology department in 2017, when she was felt to have fibromyalgia with related depression and anxiety; an MRI of the lumbar spine at that time showed mild degenerative change and an EMG suggested bilateral multilevel lumbosacral radiculopathy.  (Tr. 926.)  She continued to complain of diffuse pain, and reported that she had requested a rheumatology examination in order to receive a tender point examination and another EMG for her disability application.  (*Id.*)  Her physical examination reflected a normal range of motion and no synovial proliferation or joint effusion, but with diffuse myofascial tenderness.  (Tr. 928.)  Dr. Blumenthal assessed fibromyalgia, and advised Ms. Larcomb that treatment of her fibromyalgia was best directed at the underlying causes, including depression and anxiety; he said she could request a neurology consultation to investigate whether she had lumbar radiculopathy.  (Tr. 926.)

### 2.    Opinion Evidence

#### i.    Primary Care Provider

On February 12, 2021, Dr. Tanio completed a physical medical source statement.  (Tr. 897-98.)  When asked for medical findings supporting her assessment, she listed Ms. Larcomb's diagnoses of fibromyalgia, degenerative disc disease of the lumbar spine, COPD/emphysema, anxiety, and anemia.  (Tr. 897.)  Dr. Tanio then opined that Ms. Larcomb could: lift/carry five pounds occasionally and zero pounds frequently; stand/walk for one hour in an eight-hour workday; sit for fifteen minutes in an eight-hour day; never climb, balance, stoop, crouch, kneel, or crawl; rarely reach; never push/pull; and occasionally perform fine or gross manipulation. (Tr. 897-98.)  Dr. Tanio opined that the following environmental restrictions affected Ms. Larcomb's impairments: heights, moving machinery, temperature extremes, pulmonary irritants,

and noise.  (Tr. 898.)  Dr. Tanio also indicated that Ms. Larcomb had been prescribed a cane, a brace, a TENS unit, and breathing machine.  (*Id.*)  She opined that Ms. Larcomb needed to be able to alternate positions, elevate her legs to 45 degrees, and take additional rest periods at will.  (*Id.*)  She also opined that Ms. Larcomb experienced severe pain that would interfere with her concentration, would take her off task, and would cause absenteeism.  (*Id.*)

ii.    **Consultative Examination**

On November 6, 2020, Ms. Larcomb underwent a psychological consultative examination, performed by Charles F. Misja, Ph.D.  (Tr. 884-88.)  Ms. Larcomb complained of fibromyalgia, high blood pressure, degenerative disc disease, emphysema, chronic pain, chronic nausea, chronic headaches and memory issues.  (Tr. 885.)  Her reported medications included Triamterene, Clonidine, Loratadine, Valium, Soma, Albuterol, Incruse Ellipta, Ondansetron, and Sucralfate and Lidocaine.  (*Id.*)  She was noted to walk with a normal gait and without the use of any assistive devices.  (*Id.*)

Ms. Larcomb reported that she had not received outpatient mental health services or been hospitalized for a psychiatric problem, but reported feeling depressed and tearful.  (Tr. 886.)  She said she would not take medications for depression because of her stomach issues.  (*Id.*)  She also reported attempting teletherapy but said she had insurmountable technology problems.  (*Id.*)

On examination, Ms. Larcomb made good eye contact, but cried almost continuously during the interview and was in emotional distress.  (*Id.*)  Her affect was constricted and her mood was depressed.  (*Id.*)  She was estimated to function in the average range of intellectual ability and had adequate insight and judgment.  (Tr. 887.)

Dr. Misja opined that Ms. Larcomb would be able to understand, remember, and implement ordinary instructions, and would have minimal problems maintaining attention and

concentration, maintaining persistence and pace, performing simple and multi-step tasks, and responding appropriately to work pressures in a work setting.  (Tr. 888.)

### iii.     State Agency Reviewers

Ms. Larcomb's physical RFC was assessed at the initial level on August 26, 2020 by state agency medical consultant Leon Hughes, M.D.  (Tr. 81-83.)  Dr. Hughes opined that Ms. Larcomb's physical impairments limited her to medium work, with no climbing of ladders, ropes, or scaffolds, and no unprotected heights or hazardous machinery.  (Tr. 82-83.)

Ms. Larcomb's mental RFC was assessed at the initial level by state agency psychological consultant Courtney Zeune, Psy.D., on November 19, 2020.  (Tr. 80-81.)  Dr. Zeune opined that Ms. Larcomb's mental impairments would have no more than mild limitations on her functioning, and were not severe.  (*Id.*)

On reconsideration in March 2021, state agency consultants Dana Schultz, M.D., and David Dietz, Ph.D., affirmed Dr. Hughes' and Dr. Zeune's findings. (Tr. 89-92.)

### C.     Hearing Testimony

### 1.     Plaintiff's Testimony

At the hearing on July 15, 2021, Ms. Larcomb testified that she lived alone in a mobile home, could drive, had an associate's degree, and was a certified paramedic.  (Tr. 41.)  She stopped working as a paramedic in 2014 because her conditions did not allow her to do any kind of heavy or repetitive lifting.  (Tr. 43-44.)  She was dealing with back complications at the time and found intermittent work thereafter.  (Tr. 44.)

Ms. Larcomb testified that she could no longer work full time because she was unstable and unreliable, explaining that her day-to-day activity was limited by how much she was able to breathe and move each day.  (Tr. 46.)  She could do small, task-oriented things, but still found it

hard to follow through due to forgetfulness.  (*Id.*)  She had a tender-point examination to confirm a fibromyalgia diagnosis.  (Tr. 47.)  She testified that her pain was horrible and would leave her breathless.  (*Id.*)  She would become dizzy from her breathing issues and could not bend over or put on her shoes.  (*Id.*)  She had pain everywhere, including her lumbar and cervical spine, hips, shoulders, and into her arms; she also had increased weakness.  (Tr. 47-48.)  She said her fibromyalgia pain started in her upper extremities, from her neck and shoulders into her arms and hands, and that she was unable to hold things.  (Tr. 49.)  The pain also came from her hips down into her knees, legs, and feet.  (*Id.*) Exertion and temperature changes made her breathing worse. (*Id.*)  She also had GI issues that caused nausea, vomiting, and diarrhea.  (Tr. 50.)

Ms. Larcomb estimated that she had needed to go to the emergency room ten or twenty times in the past couple of years.  (Tr. 56.)  She had gone for hypertension within stroke range, uncontrollable nausea and vomiting, and a number of falls.  (*Id.*)

Ms. Larcomb testified that she had a nebulizer for her breathing problems.  (Tr. 48-49.)  She was taking muscle relaxers, but was limited in her ability to take those medications due to her gut issues.  (Tr. 49-50.)  She had a past cholecystectomy and had her gallbladder removed, which caused absorption issues and vitamin deficiencies.  (Tr. 50.)   She took probiotics for her GI issues, which helped somewhat.  (*Id.*)  She was not in physical therapy and had not been recommended for surgery for her back issues.  (Tr. 52.)  She used a TENS unit.  (Tr. 53.)

She testified that she was unable to complete an eight-hour workday due to her conditions.  (Tr. 50*.*)  She said she could only stand for two to three minutes at a time, and then would need to sit down for a couple of minutes.  (Tr. 51.)  If she sat for more than that, the pain became unbearable and she had to move.  (Tr. 52.) She was unable to get comfortable.  (Tr. 51.) She could only walk to her bathroom and back, a distance of about fifteen feet.  (*Id.*)  She did not

exercise outside of completing breathing exercises.  (*Id.*)  She could lift less than five pounds.  (*Id.*)  In addition, her memory fog from fibromyalgia caused memory issues and an inability to complete tasks.  (Tr. 52.)

Regarding daily activities, Ms. Larcomb testified that she used grocery delivery services to have things delivered to her house.  (Tr. 54.)  She sometimes went to the grocery store for sme small items, but used a motorized cart.  (*Id.*)  She had two dogs and two cats, but a friend took her dogs for their walks.  (*Id.*)  She liked to birdwatch.  (*Id.*)  Her friends and neighbors visited her, but she had no family in the area.  (Tr. 54-55.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Larcomb's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could not perform Ms. Larcomb's past relevant work, but could perform representative positions in the national economy, including information clerk, mail clerk, and a marker.  (Tr. 62-66.)  He also testified that it would preclude competitive employment if the person would either be off task 15% or absent more than two days a month.  (Tr. 66.)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

10

experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her September 15, 2021 decision, the ALJ made the following findings:[1]

_____
[1] The ALJ's findings are summarized.

1.    The claimant meets the insured status requirements of the Social Security Act through September 31, 2021.  (Tr. 17.)

2.    The claimant has not engaged in substantial gainful activity since February 14, 2020, the amended alleged onset date.  (*Id*.)

3.    The claimant has the following severe impairments: fibromyalgia, degenerative disc disease of the lumbar and cervical spine, bilateral multilevel lumbar radiculopathy, and peripheral neuropathy.  (*Id*.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can occasionally climb ramps and stairs, and never climb ladders, ropes, and scaffolds; she can occasionally stoop, kneel, crouch, and crawl; she can frequently handle and finger with the bilateral upper extremities; she should avoid exposure the dangerous, moving machinery, and unprotected heights; and she should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  (Tr. 19-20.)

6.    The claimant can perform her past relevant work as a medical clerk.  (Tr. 23.)

7.    The claimant was born in 1971 and was 46 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age. (*Id*.)

8.    The claimant has at least a high school education.  (*Id*.)

9.    Transferability of job skills is not material to the determination of disability. (*Id*.)

10.   In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including information clerk, mail clerk, and a marker.  (Tr. 23-24.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 14, 2020, through the date of the decision on September 1, 2020. (Tr. 24.)

## V.    Plaintiff's Arguments

Ms. Larcomb asserts two assignments of error.  First, she argues the ALJ erred when she rejected the medical opinion of Ms. Larcomb's treating primary care provider, Dr. Tanio.  (ECF Doc. 9, pp. 1, 11-14.)  Second, she argues the ALJ erred when she assigned an RFC based her own interpretation of the medical evidence.  (*Id.* at pp. 1, 11-12, 14-16.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ Erred in Assessing Persuasiveness Treating Primary Care Provider's Opinion**

In her first assignment of error, Ms. Larcomb argues that the ALJ erred when she found Dr. Tanio's opinion unpersuasive. (ECF Doc. 9, pp. 12-14 (citing Tr. 22).) The Commissioner argues in response that the ALJ's opinion was adequately explained and supported by substantial evidence. (ECF Doc. 10, pp. 4-8.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  An ALJ must explain how he considered consistency and supportability but need not explain how he considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In assessing the persuasiveness of Dr. Tanio's opinion, the ALJ explained:

I find the medical source statement of Dr. Tanio unpersuasive [].  Dr. Tanio determined that the claimant can perform much less than sedentary level work, such

as lifting and carrying up to five pounds occasionally, standing/walking for one hour per workday, sitting for 15 minutes per workday, never performing postural activities, needing additional breaks throughout the workday, requiring a cane for ambulation, and needing to elevate her legs at will. <u>These opinions are inconsistent with the medical record as a whole, including the claimant's generally benign diagnostic and clinical findings, her conservative treatment methods for physical health impairments, and her varied activities of daily living that indicate a greater level of functioning than alleged at the hearing</u> []. In addition, <u>Dr. Tanio provided little supporting evidence or explanation for these extreme limitations</u> aside from largely listing the claimant's diagnoses and subjective allegations of pain, which are not fully consistent with the record for the reasons listed above.

(Tr. 22 (internal citations omitted) (emphasis added)).

Ms. Larcomb argues that the ALJ's reasoning is inadequate because: (1) she suffers very severe chronic pain, and has consistently made subjective reports of intense pain; (2) contrary to the ALJ's findings, her treatment has not been "conservative," her daily activities were very limited, her medical imaging confirmed degeneration in her back and neck, and she had positive tender points; and (3) the medical record is consistent with Dr. Tanio's findings, which "ought to have been given deference."  (ECF Doc. 9, pp. 15-16.)

As to the first contention—that Ms. Larcomb has made consistent subjective reports of pain—this observation neither undermines the ALJ's explanation of her persuasiveness finding nor deprives her finding of the support of substantial evidence.  The ALJ acknowledged Ms. Larcomb's subjective reports of pain (Tr. 20) but found her allegations to be "less than fully consistent with the evidence," explaining:

The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. <u>Diagnostic test results and physical examination findings have been largely unremarkable</u>, and <u>the claimant had a mostly conservative treatment history</u> for her physical health impairments since the alleged onset date, with conservative measures used such as pain medications, ice application, a TENS unit, and physical therapy sessions. For example, a physical examination performed in 2020 revealed that a straight leg raise test was negative in the seated position bilaterally, the claimant's gait and balance were normal, a Romberg test was negative, and tandem walking was normal []. Likewise, xrays of the chest were consistently normal despite the claimant's

breathing issues []. <u>Moreover, the claimant engages in a variety of daily activities</u> <u>that indicate a greater level of functioning than alleged</u>. For example, she reported in her function report from August of 2020 that she engaged in daily activities such as feeding her dogs, making simple meals, completing household chores such as dusting, driving, and going shopping at the closest store if needed []. Thus, there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above.

(Tr. 21 (internal citations omitted) (emphasis added).)  This explanation for discounting Ms.

Larcomb's subjective reports of pain largely mirrors the ALJ's stated reasons for finding the

"extreme" limitations in Dr. Tanio's opinion to be "inconsistent with the record as a whole." (Tr.

22.)  Thus, Ms. Larcomb's subjective reports of pain were adequately considered by the ALJ.

As to the second contention—that the record does not support the ALJ's finding that Dr.

Tanio's opinion was "inconsistent with the medical record as a whole, including the claimant's

<u>generally benign diagnostic and clinical findings</u>, her <u>conservative treatment methods</u> for

physical health impairments, and her <u>varied activities of daily living</u> that indicate a greater level

of functioning than alleged at the hearing" (Tr. 22 (emphasis added))—the Court finds this

argument lacks merit for the reasons set forth below.

Ms. Larcomb suggests that the ALJ erred in describing her diagnostic and clinical

findings as "generally benign" because her medical imaging confirmed degeneration in her spine

and her physical examination noted tender points.  (ECF Doc. 9, pp. 13-14.)  The Court finds no

error in the ALJ's characterization of the clinical or diagnostic findings in the record as

"generally benign," when her physical examinations were unremarkable except for tenderness

and fibromyalgia tender points, and her imaging was limited to mild disc degeneration.

Ms. Larcomb also argues that her "pain has not been under 'conservative treatment,'"

since she obtained diagnostic imaging, used medications and medical marijuana, and treated with

pain management.  (ECF Doc. 9, p. 13.)  The Court finds no error in the ALJ's characterization

of Ms. Larcomb's treatment as conservative.  The ALJ explained that "conservative measures

used" by Ms. Larbcomb included "pain medications, ice application, a TENS unit, and physical therapy sessions."  (Tr. 21.)  Since the alleged onset date, the record suggests her treatment was limited to IV lidocaine infusions, medications (including medical marijuana), a short period of teletherapy, and a TENS unit.  The ALJ did not err in characterizing such treatment as conservative, or in finding such treatment inconsistent with Dr. Tanio's opined limitations.  *See, e.g., Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) (finding ALJ reasonably viewed "treatments [that] were conservative and largely confined to pain medications" as inconsistent with a treating provider's medical opinion).

Ms. Larcomb finally argues that her "reported activities of daily living remained very limited" (ECF Doc. 9, p. 14), but does not suggest that the ALJ mischaracterized the record when she described her activities as follows: "feeding her dogs, making simple meals, completing household chores such as dusting, driving, and going shopping at the closest store if needed." (Tr. 21 (citations omitted).)  Given Dr. Tanio's stated opinion that Ms. Larcomb cannot sit more than 15 minutes in an eight-hour day, stand or walk more than one hour in an eight-hour day, or ever climb, balance, stoop, crouch, kneel, crawl, push, or pull (Tr. 897-88), the Court finds no error in the ALJ's characterization of Ms. Larcomb's reported activities of daily living as "indicat[ive of] a greater level of functioning" (Tr. 22).

For the reasons stated, the Court finds no merit to Ms. Larcomb's contention that the ALJ's persuasiveness explanation lacked record support.

As to the third contention—that the medical record is consistent with Dr. Tanio's findings, which "ought to have been given deference"—the Court finds that Ms. Larcomb has misstated the applicable standard.  First, to the extent Ms. Larcomb's argument rests on her assertion that Dr. Tanio's opinion is consistent with the medical record, that is not the legal

18

standard.  Even if a preponderance of the evidence supports a finding that Dr. Tanio's opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, regardless of whether there was evidence to support a finding that the limitations outlined in Dr. Tanio's opinion were persuasive, the question before this Court is whether there was substantial evidence in the record to support the ALJ's finding to the contrary.

Second, to the extent Ms. Larcomb's argument rests on her assertion that Dr. Tanio's opinion "ought to have been given deference" because she is a treating provider (ECF Doc. 9, p. 14 (citations omitted)), her argument relies on old regulations that apply only to claims filed before March 27, 2017.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The regulations governing this claim provide—contrary to Ms. Larcomb's argument—that the Commissioner "<u>will not defer</u> or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . .  including those from [a claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a) (emphasis added) and 416.920c(a) (same).[2]

For the reasons stated above, the undersigned finds the ALJ evaluated Dr. Tanio's opinion in accordance with the regulations, sufficiently articulated her reasons for finding the opinion not persuasive, and made findings that were supported by substantial evidence.  Accordingly, the Court finds Ms. Larcomb's first assignment of error to be without merit.

---

[2] Rule 11 of the Federal Rules of Civil Procedure provides, in pertinent part: "By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).  Counsel for Ms. Larcomb is advised that their misstatement of the governing standard in this case was not acceptable, and that similar misstatements in future briefing will be viewed with substantial disfavor.

**C.     Second Assignment of Error: Whether ALJ Erred by Failing to Develop the Record**

In her second assignment of error, Ms. Larcomb challenges the opinions of the state agency medical consultants that she could perform medium work, but also contends that the ALJ "agree[d] that the State Agency consultants did not possess sufficient information from which to form a reliable opinion."  (ECF Doc. 9, pp. 14-15.)  Therefore, rather than challenging the ALJ's finding that the state agency opinions were "somewhat persuasive," Ms. Larcomb instead argues that the ALJ "erred by failing in her duty to develop the record" when she adopted a light exertional RFC without first "requesting a medical examination or . . . eliciting testimony from a medical expert in order to attain a reliable medical opinion regarding Ms. Larcomb's residual functional capacity."  (*Id.* at pp. 15-16.)  The Commissioner responds that there was no error because the ALJ need not base the RFC on a medical opinion.  (ECF Doc. 10, pp. 8-10.)

An ALJ must determine a claimant's RFC based on all the relevant evidence in the record.  *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  That includes medical opinion evidence.  But an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (finding an ALJ did not have a duty to obtain an additional medical opinion despite giving "no weight" to the relevant medical opinions) (citing *Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).

As the Sixth Circuit has explained, requiring an ALJ to base his RFC on a medical opinion would effectively confer on medical providers "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted).  Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 F. App'x at 157.

The Sixth Circuit also provides that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").[3]

Here, the ALJ considered the opinions of the state agency medical consultants—who found Ms. Larcomb could perform medium work with certain limitations—but concluded that those opinions were only "somewhat persuasive," explaining:

> [A]dditional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state examiners. Nevertheless, I agree with the DDS consultants that the claimant's physical impairments are not disabling in nature for the reasons listed above, including her generally benign diagnostic and clinical findings, and her mostly

---

[3] The regulations indicate a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control."  20 C.F.R. § 404.1519a(b).

conservative treatment history for her physical health impairments since the alleged onset date.

(Tr. 22.)  While Ms. Larcomb points out that the Commissioner made some unsuccessful attempts to obtain medical records from Dr. Tanio, Southwest General, and University Hospitals (ECF Doc. 9, p. 15 (citing Tr. 337, 860, 870, 874, 876, 878)), it is evident that records from those providers were ultimately obtained and considered by the ALJ (*see, e.g.*, Tr. 21, 345, 364-843, 897-98, 925-1015) along with other evidence that post-dated the state agency review.  The record thus supports a finding that the ALJ considered both the state agency opinions and the later-obtained evidence.  The record further reflects that the ALJ found the state agency opinions only "somewhat persuasive" in light of the later evidence, adopted a more restrictive physical RFC as a result, and adequately explained the reasons for both her persuasiveness finding and her ultimate adoption of non-disabling physical RFC limitations.  (Tr. 22.)

Ms. Larcomb's broad argument that it was error for the ALJ to adopt a light RFC without first "requesting a medical examination or . . . eliciting testimony from a medical expert" (ECF Doc. 9, p. 15) must fail.  "The Social Security Act instructs that the ALJ—not a physician— ultimately determines a claimant's RFC."  *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).  The Sixth Circuit has explicitly rejected the argument that an RFC "cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *Mokbel-Aljahmi*, 732 F. App'x at 401.  And the Sixth Circuit has likewise found it to be within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  *Foster*, 279 F.3d at 355.  Ms. Larcomb has failed to show that the ALJ lacked authority to adopt a light RFC without obtaining further evidence, and has failed to demonstrate that the ALJ lacked substantial evidence to support her RFC finding.

For the reasons explained above, the Court finds Ms. Larcomb has failed to show that the ALJ was obligated to develop the record by obtaining additional medical opinion evidence, or that her RFC finding otherwise lacked the support of substantial evidence.  Accordingly, the Court finds Ms. Larcomb's second assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

April 8, 2024

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge